**Linda Lynette RICHARDSON, Plaintiff,**

**v.**

**CVS CORPORATION d/b/a CVS Pharmacy, Inc., and Michael Seesholtz, Defendants.**

**No. 1:00–CV–361.**

United States District Court, E.D. Tennessee at Chattanooga.

Oct. 17, 2001.

Kenneth O. Fritz, Nelson, McMahan, PArker & Noblett, Chattanooga, TN, Joe E. Manuel, Chattanooga, TN, for Plaintiff.

Larry W. Bridgesmith, Susan G. Lindsey, Waller, Lansden, Dortch & Davis, Nashville, TN, for Defendants.

## *MEMORANDUM*

EDGAR, Chief Judge.

Plaintiff Linda Lynette Richardson brings the present action against defendants CVS Corporation, d/b/a CVS Pharmacy, Inc. ("CVS"), and Michael Seesholtz. Richardson alleges that defendants violated her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615, and terminated her employment in retaliation for her assertion of FMLA rights. She also claims that CVS is liable for discrimination on the basis of plaintiff's race, sex, and age in violation of the Tennessee Human Rights Act ("THRA"),

TENN.CODE ANN. §§ 4–21–101 – 903. Finally, plaintiff brings a claim for intentional infliction of emotional distress under Tennessee common law.[1]

Presently before the Court is defendants' motion for summary judgment. (Court File No. 29). For the following reasons, the motion shall be **GRANTED IN PART and DENIED IN PART.** The motion shall be **DENIED** with respect to plaintiff's FMLA claims. The motion shall be **GRANTED** with respect to plaintiff's THRA claims of discrimination and retaliation, and her claim of intentional infliction of emotional distress.

## I. Standard of Review

FED.R.CIV.P. 56(c) provides that summary judgment will be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280–81 (6th Cir.1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir.1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943–44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir.1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435–36. The standard for summary judgment mirrors the standard for directed verdict. The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Lapeer County, Mich. v. Montgomery County, Ohio*, 108 F.3d 74, 78 (6th Cir.1997). There must be some probative evidence from which the jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 140 (6th Cir.1997). If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *University of Cincinnati v. Arkwright Mut. Ins. Co.*, 51 F.3d 1277,

---

1. Plaintiff has voluntarily dismissed all claims against defendant Seeholtz except for claims under the FMLA.

1280 (6th Cir.1995); *LaPointe v. UAW, Local 600,* 8 F.3d 376, 378 (6th Cir.1993).

## II. Facts

Plaintiff, who is an African American female, was hired by CVS as a cashier for the company's Brainerd store on March 31, 1994. At that time she was forty-seven (47) years old. Soon after Richardson commenced employment, the Brainerd store closed. Plaintiff, the store manager, and another coworker were transferred to the Signal Mountain store. Soon after that transfer, Richardson was promoted to the position of shift supervisor.

Richardson progressed through various job positions at CVS. Sometime in 1995, she was promoted into the company's management training program. In accordance with standard procedure, Richardson was transferred to the East Brainerd store, a "training store," to complete that program. She completed management training in April 1996. At that point, she was working as an assistant manager, and she had responsibility for administering the company's equal employment opportunity policies and procedures.

Within seven months of completing management training, Richardson was promoted to the position of store manager. Her first assignment in that capacity was at CVS's East Ridge store. She began working in that position in December 1996.

Sometime during the fall of 1997, Richardson's supervisor, CVS District Manager Richard Kennedy, promoted plaintiff to the position of store manager of the Wilcox store. With the promotion, Richardson received a raise in pay. She was assigned the responsibility of "tak[ing] control of the store and get it functioning properly." (Court File No. 29, Richardson depo p. 53). When she took over the store, it had many problems including suffering from shrinkage (stolen property), lack of record-keeping, a disorganized stockroom, and issues

with some employees. (Court File No. 33, Richardson aff. ¶ 3). The Wilcox store was a "target store," which means it was known to have "historically bad inventory, shrinkages." (Richardson aff. ¶ 8). Notably, in becoming the store manager for the Wilcox store, Richardson replaced a male employee.

Initially, Kennedy told Richardson that he would appoint two assistant store managers to the Wilcox store. However, he later informed her that the Wilcox store's budget would not support two assistant managers. Richardson knew that each store's sales volume controlled the number and type of management-level employees assigned to that store. However, she complained to Kennedy that she required two assistant managers. In response, Kennedy assigned one assistant manager to the store. That position remained filled during Richardson's tenure at the Wilcox store.

At some point after taking over the Wilcox store, Richardson contacted Kennedy and told him she had received a telephone call from someone who alleged that pharmacy technicians were stealing and selling drugs. Richardson requested that Kennedy install video surveillance cameras "all over" the store to catch any employee engaging in that behavior. Kennedy did not install video cameras. However, he told Richardson that he would ask the loss prevention department to investigate the situation. Richardson admits that she never worked in a CVS store that was equipped with video surveillance cameras.

In May 1998, a Wilcox store hourly employee, Vivian Harris, complained to Kennedy that Richardson was requiring her to work through her lunch hour. Richardson admitted this had occurred on several occasions, although it violated CVS policy and wage and hour laws. (Richardson depo. pp. 76, 80). As a result, Kennedy

met with Richardson on May 13, 1998, and gave her a written warning for her violation of CVS policy and wage and hour laws.

Following Richardson's violation of this policy, Lori Bennett, CVS' Field Employee Relations Manager at the time, visited the Wilcox store. Bennett met with the store's employees and conducted a morale survey. The survey indicated extremely low employee morale in the Wilcox store. Employees felt that Richardson lacked leadership and management skills, and that she was not properly training and developing her employees. On July 10, 1998, subsequent to the morale survey, Kennedy met with Richardson and counseled her about her poor management skills.

On or around that date, Kennedy transferred Richardson to the Rossville store. Richardson testified in her deposition that this store was "in fair shape . . . but not really up to par." (Richardson depo. p. 104). Neither Richardson's title nor salary changed. However, the Rossville store did not have an assistant manager. When Richardson requested extra management help in the store, Kennedy assigned a shift supervisor to the store. Additionally, Richardson trained another employee to be a shift supervisor. Later, Kennedy assigned an assistant manager, Joe Barnes, to the Rossville store. In response to Richardson's requests, he sent another management-level employee to the Wilcox store to assist on several occasions. On more than one occasion, Kennedy sent crews of management-level employees to help Richardson get the store cleaned up and ready for inventory. (Richardson depo. p. 108).

On September 17, 1998, Kennedy rated Richardson poorly on her performance evaluation. Due to her performance, Kennedy did not give Richardson a raise. On the same day, Kennedy counseled Richard-son for leaving five bank deposits in the store in violation of the CVS policy requiring deposits to be made daily.

On November 10, 1998, Kennedy counseled Richardson because price cut signs had not been put up in the store, because the stockroom was not organized, and because the stockroom had not been straightened up since his last visit to the store. The coaching and counseling form that Kennedy completed on that occasion warned that "[f]ailure to comply with CVS policy will result in immediate termination. This is a final warning." Richardson refused to sign the coaching and counseling form. According to the form, Kennedy was scheduled to revisit the store on November 20, 1998, by which time the storeroom was expected to be organized. (Court File No. 29, Richardson depo. ex. 19).

Following these counseling sessions and her poor performance review, Richardson wrote a letter to Tom Ryan, CVS's President and Chief Executive Officer. In the letter, she complained of "harassment and discrimination" by Kennedy on the bases of race and sex. On November 24, 1998, Richardson filed a charge of discrimination with the Tennessee Human Rights Commission ("THRC"). She did not indicate in her charge whether she believed race, sex, age, or some combination thereof was the basis for her claim. (Court File No. 31).

In December 1998, following receipt of Richardson's letter, Lori Bennett and John Berg, a CVS regional store manager, met with Richardson in her store. They discussed Richardson's complaints and agreed to meet in Knoxville, Tennessee, with Kennedy in attendance as well. The second meeting was held in Berg's office in Knoxville and lasted four to six hours. Berg took Richardson's complaints seriously, investigated her claims and concerns, and responded to them. (Richard-

son depo. p. 140–142). Berg allotted more hours to Richardson's store to allow her to hire additional employees and hired a store greeter for Richardson's store. After that meeting, Richardson felt like things improved for about a month. (*Id.* at 143). Richardson did not make any further complaints about Kennedy to Berg or Ryan.

On February 11, 1999, Kennedy counseled Richardson for her admitted failure to attend a mandatory meeting for all managers in the district. Richardson acknowledges that one of her responsibilities as store manager was to schedule other employees to work so she could attend such meetings. (Richardson depo. pp. 146–48). However, she contends that she did not have available staff members to schedule during that time. On March 13, 1999, Kennedy counseled Richardson because of numerous problems noted in her store and overall "store conditions below acceptable level." (Richardson depo. ex. 22).

In approximately June 1999, defendant Michael Seesholtz took over Kennedy's position as district manager. Seescholtz also found that Richardson did not maintain her store in compliance with CVS policies and requirements. He prepared a memo to this effect, which was addressed to Richardson's personnel file. Richardson does not recall seeing most of the memo. However, she admits that some portion of it was hanging up in her office. (Richardson depo. p. 151).

On September 2, 1999, Richardson was in a car accident. As a result, she was unable to return to work for a period of approximately four weeks. During her leave, Richardson provided Seescholtz with several doctor's statements. Initially, Richardson's physician established her return-to-work date as September 7, 1999. That date was extended to September 14, 1999, and then extended to September 20,

1999. Richardson provided CVS with timely notifications of all of these dates in the form of letters from her physician.

On September 20, 1999, Richardson contacted Seescholtz and told him that she would not be able to return to work on September 20 because she was still sick. She informed him that she would provide him with a statement from her doctor and keep him advised of her condition. Richardson testified that she called Seescholtz and left messages for him after September 20. She recollects that she next spoke with him on September 23, 1999. Seescholtz denies that he spoke with her on this day.

On September 29, 1999, Richardson sent Seescholtz a statement from her doctor excusing her from work from September 20 until October 5, 1999. On October 5, 1999, Richardson reported to work. Seescholtz told her that she would have to provide current medical documentation of her ability to work before she resumed her duties. Richardson obtained the requested documentation from her doctor and faxed them to Seescholtz that evening.

Unfortunately, that same evening, Richardson's daughter became very ill and was hospitalized. Richardson spoke with Seescholtz, who advised her to stay home and care for her daughter. At some point, Richardson reported to Seescholtz that she was ready to return to work on October 25, 1999. On October 24, 1999, Seescholtz contacted Richardson and asked her to report to his office before returning to work. When they met the next day, Seescholtz informed her that because he had not heard from her for a period of more than three consecutive days following her September 20 phone call, she was being terminated for job abandonment pursuant to CVS policy. This decision was reflected in a memo Seescholtz prepared on October 5, 1999. He testified that he did not in-

formed Richardson of this decision prior to October 25 because of the extenuating circumstances involving her daughter's illness.

At the time of her termination, Richardson was fifty-two years old. During her absence in September and October of 1999, Richardson's job was performed by a younger, white, male employee. On September 12, 2000, Richardson filed this action in the Circuit Court of Hamilton County, Tennessee. Defendants removed it to this Court on October 25, 2000.

### III. Analysis

#### A. FMLA Claims

#### 1. Denial of FMLA Rights

The Family and Medical Leave Act provides employees with certain substantive rights. For purposes of this case, the Act provides that eligible employees may take twelve weeks of leave within a twelve month period when the employee suffers from "a serious health condition" or to "care for ... the daughter of the employee." 29 U.S.C. § 2612(a)(1)(C) and (D). The Act also makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by this subchapter." 29 U.S.C. § 2615(a)(1). For purposes of summary judgment, the parties do not dispute the fact that both plaintiff and CVS were covered by the FMLA. They also do not dispute that plaintiff suffered a serious health condition or that she spent time caring for her ill daughter.

The employee has the initial obligation to give her employer notice that leave is needed. When leave is foreseeable, the employee is required to give the employer thirty days advance notice. 29 U.S.C. § 2611(e)(2)(B). However, if the date to commence treatment is necessarily less than thirty days, the employee need only give such notice as is "practicable." *Id.* The parties also do not dispute that Richardson promptly notified CVS of her need for leave after her car accident.

■ Defendants argue, however, that plaintiff did not appropriately communicate her need for leave beginning on September 20, 1999, because she did not provide CVS with medical documentation of her need for additional leave until September 29, 1999. Essentially, defendants' argument is that Richardson had a strict obligation to ensure that CVS had up-to-date medical documentation regarding her absence from work.

The Court disagrees with this proposition. Although the employee has the initial obligation to request leave, the employer bears certain obligations under the FMLA as well. Once an employee informs her employer that she need leave for a reason that qualifies under the FMLA, "the employer bears the obligation to collect any additional information necessary to make the leave comply with the requirements of the FMLA." *Hammon v. DHL Airways, Inc.,* 165 F.3d 441, 450 (6th Cir. 1999). The employee need not actually mention the Family and Medical Leave Act in requesting leave. Rather, "the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Brohm v. JH Props., Inc.,* 149 F.3d 517, 523 (6th Cir.1998) (quoting *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 762 (5th Cir.1995)).

In the present case, defendants do not argue that Richardson's initial notice was insufficient. Nor do they argue that her medical condition was not subject to the FMLA. Instead, defendants argue merely that plaintiff had an ultimate obligation not only to keep defendants apprised of her medical condition, but to ensure that defendants had up-to-the-minute medical

verification of the specific dates through which she needed leave.

The Court finds that to the extent CVS required notice and medical documentation of her condition, plaintiff complied with the requirements of the FMLA. The record facts demonstrate that plaintiff gave defendants immediate notice of her need for leave after her car accident. It is also undisputed that plaintiff provided defendants with up-to-the-minute medical documentation about the intended length of her leave through September 20, 1999. On September 20, 1999, when Richardson was still unable to return to work, she promptly contacted Seescholtz with that information. Although she did not provide medical documentation until September 29, 1999, nothing in the record indicates that plaintiff was informed of the need for this information. Section 2913(a) of the FMLA requires only that the employee provide medical documentation to the employer in a timely manner. Because the employer has the ultimate obligation to collect the information necessary to make the leave comply with the FMLA, and because nothing in the record indicates that defendants informed Richardson that they wanted constant up-to-the-minute medical documentation, the Court cannot find that Richardson's provision of medical documentation was untimely or that she necessarily abandoned her job by not providing such information for a period of some days.

### 2. *Retaliation Under the FMLA*

Plaintiff also claims that she was terminated in retaliation for her exercise of her FMLA rights. The FMLA makes it unlawful for an employer to discharge an employee because that individual has opposed any practice made unlawful by the Act. 29 U.S.C. § 2615(a)(2). The parties agree that a claim of retaliation under the FMLA should be analyzed under the framework developed under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e – 2000e–17. *Accord Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir.1998); *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 712 (7th Cir.1997); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

Under Title VII, to survive summary judgment, a plaintiff must first establish the elements of *prima facie* case of retaliation. To establish her *prima facie* case, Richardson must provide evidence that (1) she engaged in protected activity; (2) the activity was known to defendants; (3) she was subjected to an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. *Nguijen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999); *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir.1997). The burden of establishing this *prima facie* case is not arduous. *Allen v. Michigan Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir.1999); *Avery Dennison*, 104 F.3d at 861. Defendants concede for purposes of summary judgment that plaintiff has established the elements of a *prima facie* case.

Once a plaintiff has established a *prima facie* case of retaliation, the burden of production shifts to the defendants to articulate a legitimate, non-discriminatory reason for her termination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir.1997); *E.E.O.C. v. Avery–Dennison Corp.*, 104 F.3d 858, 862 (6th Cir.1997). Defendants assert that Richardson was terminated because she failed to report to work for a week between September 20 and September 29, 1999. They contend that failure to report to work constitutes job abandon-

ment under CVS policy. This reason, as articulated, is a legitimate, non-discriminatory reason for an employer to terminate an employee.

■ After such an assertion by the defendants, the plaintiff assumes the burden of demonstrating that the defendant's proffered reason is a mere pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089; *Williams*, 132 F.3d at 1131; *Avery Dennison*, 104 F.3d at 862. The Court finds that plaintiff has presented sufficient proof to raise a genuine issue of material fact with respect to the issue of pretext. First, plaintiff presents a strong *prima facie* case of retaliation under the FMLA. Additionally, she presents undisputed proof that she contacted Seescholtz on September 20, 1999, to promptly inform him that she was still medically unable to return to work. Arguably, plaintiff contacted Seescholtz again on September 23, 1999. She provided medical documentation supporting her need for increased leave on September 29, 1999, a mere six or nine days subsequent to her contact with Seescholtz. Finally, as the Court has previously noted, the record does not contain any evidence that plaintiff was made aware that CVS required medical documentation to be up-to-the-minute at all times during her medical leave. Plaintiff has sustained her summary judgment burden with respect to this claim.

### Individual Liability

■ Defendants seek to dismiss plaintiff's FMLA claims against defendant Seescholtz on the ground that the FMLA does not provide for individual liability. Federal courts are in conflict on the issue of whether a supervisor can be individually liable for violations of the FMLA. The only Court of Appeals to address the question of individual liability is the Eleventh Circuit, *see Wascura v. Carver*, 169 F.3d 683, 687 (11th Cir.1999) (finding public official

sued in individual capacity not personally liable under FMLA), and that case arose in the public sector context. The Fourth Circuit Court of Appeals has specifically avoided dealing with the question of individual liability under the FMLA on at least two occasions. *See Lizzi v. Alexander*, 255 F.3d 128, 136 n. 1 (4th Cir.2001); *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 441 n. 5 (4th Cir.1999). The Sixth Circuit has not yet faced this question.

The majority of courts that have addressed the issue have found that individuals can be subject to liability under the FMLA. *See Morrow v. Putnam*, 142 F.Supp.2d 1271, 1275–76 (D.Nev.2001); *Longstreth v. Copple*, 101 F.Supp.2d 776, 780 (N.D.Iowa 2000); *Meara v. Bennett*, 27 F.Supp.2d 288, 291 (D.Mass.1998); *Bryant v. Delbar Prods., Inc.*, 18 F.Supp.2d 799, 807 (M.D.Tenn.1998); *Rupnow v. TRC, Inc.*, 999 F.Supp. 1047, 1048 (N.D.Ohio 1998); *see also Cooper v. Harbour Inns of Baltimore, Inc.*, 2000 WL 351373, *4 (D.Md. Mar.20, 2000); *Evans v. Henderson*, 2000 WL 1161075, *3 (N.D.Ill. Aug.16, 2000); *Holt v. Welch Allyn, Inc.*, 1997 WL 210420, * 2–3 (N.D.N.Y. Apr.15, 1997); *Beyer v. Elkay Mfg. Co.*, 1997 WL 587487, *4 (N.D.Ill. Sept.19, 1997); *but see Wascura v. Carver*, 169 F.3d 683, 686–87 (11th Cir.1999) (finding government officers not liable in individual capacity under FMLA because Circuit precedent denies individual liability for government official in individual capacity under FLSA); *Carter v. Rental Uniform Serv. of Culpeper, Inc.*, 977 F.Supp. 753, 759 (W.D.Va.1997). The Court finds the reasoning expressed in the cases holding that individual liability is available under the FMLA to be persuasive.

Section 2615(a)(1) of the FMLA prohibits an "employer" from interfering with, restraining, or denying FMLA rights. Section 2615(a)(2) prohibits an "employer" from discharging an employee for exercis-

ing her FMLA rights. Section 2611(4)(A) defines "employer" in the following manner:

The term "employer"

(i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year;

(ii) includes—

(I) any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer; and

(II) any successor in interest of an employer;

(III) includes any "public agency," as defined in section 203(x) of this title; and

(IV) includes the General Accounting Office and the Library of Congress.

As many courts have noted, this definition is quite similar to the definition of "employer" contained in the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219. The FLSA defines "employer" to "include[ ] any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not in-

clude any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." 29 U.S.C. § 203(d). Both statutes define "employer" to include an agent of the employer who acts directly or indirectly on behalf of an employer.

In light of this similarity, many courts have determined that the question of individual liability under the FMLA should be resolved in accordance with the parallel issue under the FLSA. See Wascura, 169 F.3d at 686; Morrow v. Putnam, 142 F.Supp.2d. 1271, 1274 (D.Nev.2001); Longstreth v. Copple, 101 F.Supp.2d 776, 779 (N.D.Iowa 2000); Meara v. Bennett, 27 F.Supp.2d 288, 291 (D.Mass.1998); Bryant v. Delbar Prods., Inc., 18 F.Supp.2d 799, 807 (M.D.Tenn.1998). This analysis is consistent with the applicable federal regulations, which state that the term "employer" in the FMLA should be construed in accordance with the FLSA. 29 C.F.R. § 825.104. In drawing this conclusion, courts have noted the difference in the definition of "employer" contained in the FMLA and FLSA and that contained in other federal statutes, such as Title VII,[2] the Age Discrimination in Employment Act ("ADEA"),[3] 29 U.S.C. §§ 621–634; and the Americans With Disabilities Act ("ADA"),[4] 42 U.S.C. §§ 12101–12213.

2. "The term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person . . ." 42 U.S.C. § 2000e(b).

3. "The term 'employer' means a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year: Provided, That prior to June 30, 1968, employers having fewer than fifty employees shall not be considered employers. The term

also means (1) any agent of such a person . . ." 29 U.S.C. § 630(b).

4. "The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person." 42 U.S.C. § 12111(5)(A).

*Wascura,* 169 F.3d at 685; *Longstreth,* 101 F.Supp.2d at 779 (citations omitted).

Title VII, the ADEA, and the ADA definitions of "employer" do not contain language indicating that any agent acting directly or indirectly is an employer. Although those three statutes refer to an agent of an employer in their definitions, *see* n. 2–4 *supra,* the Sixth Circuit has made it clear that a supervisor who does not independently qualify as an employer cannot be individually liable under Title VII. *Wathen v. General Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997). The Sixth Circuit has determined that the "agent" language, when read in the context of the statutory schemes of Title VII, was not intended to impose individual liability. *Id.* at 405–06. That decision has been extended to the ADEA and ADA. *See Pritchard v. Southern Co. Servs.,* 102 F.3d 1118, 1119 (11th Cir.1996) (ADA); *Smith v. Lomax,* 45 F.3d 402, 403 (11th Cir.199) (ADEA).

In contrast, the term "employer," as defined in the FMLA and FLSA includes "any person who acts, directly or indirectly, in the interest of an employer." This language is broader and more expansive than that contained in the other discrimination statutes. *Accord Wascura,* 169 F.3d at 685. The Sixth Circuit has held that, in contrast to the provisions of Title VII, some individuals may be personally liable under the FLSA. *Fegley v. Higgins,* 19 F.3d 1126, 1131 (6th Cir.1994); *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir.1991). In making this determination, the Court held that "[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly ..." *Id.* at 965 (quoting *McLaughlin v. Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir. 1989)).

The FMLA also has broad remedial purposes. Section 2601 of the FMLA refers to the demands of the workplace and the needs of American families. The purpose of the FMLA is to balance these burdens in a way that promotes both the stability and economic security of families and the national interest in preserving family integrity. 29 U.S.C. § 2601. In so doing, Congress intended to remedy the societal problems associated with parents—particularly women—who are increasingly unavailable for care of their young children or sick family members but who lack the employment security necessary to do so. § 2601(a). In light of these purposes, Congress enacted a statute which gives employees certain rights to leave time for significant events while placing a burden on employers to make this possible.

The Court notes that the one relevant published case from the Eastern District of Tennessee takes the minority view. In *Frizzell v. Southwest Motor Freight, Inc.,* 906 F.Supp. 441 (E.D.Tenn.1995), District Judge Curtis Collier briefly addressed the issue of individual liability under the FMLA. That case dealt primarily with claims brought under the THRA. However, Judge Collier briefly determined that "the term 'employer' as used in the [FMLA] should be construed the same as the term 'employer' is construed under Title VII." *Frizzell,* 906 F.Supp. at 449.

This Court notes that *Frizzell* was decided in 1995, at which time there was a dearth of case law addressing the issue of individual liability under the FMLA. In fact, every case on point that was found by the Court was published well after *Frizzell.* At the present time, this Court is fortunately able to review the decisions of various district courts who have dealt with the issue of individual liability under the FLSA. The Court is persuaded by the reasoning of these later opinions and respectfully declines to concur with the decision rendered in *Frizzell.*

In light of the foregoing discussion, the Court finds that the term "employer" in the FMLA should be interpreted like the term "employer" in the FLSA. Pursuant to Sixth Circuit precedent, the Court finds that those individuals with day-to-day operational control of a company can be held liable for violations of the FMLA. *See Fegley*, 19 F.3d at 1131 (FLSA case); *Dole*, 942 F.2d at 966 (FLSA). To determine whether an individual can be an employer, the Court must look to the economic realities of the particular situation. *Id.* The Sixth Circuit has noted relevant factors to consider in the FLSA context, such as whether the individual had an ownership interest in the company, whether the individual controlled significant day-to-day functions of the business, and whether the individual determined salaries. *Fegley*, 19 F.3d at 1131.

■ The Court finds that Richardson has presented sufficient proof to raise a genuine issue of material fact as to whether Seescholtz qualifies as an "employer" under the FMLA. The record indicates that Seescholtz, as district manager, was responsible for operational control of the CVS stores in his district. The district managers who supervised Richardson made all of the decisions regarding the quality of her performance and operation of the store. Kennedy, during his tenure as district manager, was responsible for denying plaintiff a salary increase due to poor performance. Seescholtz single-handedly made the decision to terminate plaintiff's employment. These facts suggest that Seescholtz had significant operational control over the day-to-day running of CVS stores. As such, he may be liable for violations of the FMLA.

### B. THRA Claims

#### 1. Discrimination

As an alternative, Richardson claims that she was terminated because of her race, sex, and age in violation of the Tennessee Human Rights Act ("THRA"), TENN.CODE ANN. §§ 4–21–101–903. The analysis of discrimination claims under the THRA parallels that of similar claims under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e–2000e–17, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. *Tetro v. Elliott Popham Pontiac*, 173 F.3d 988, 993 (6th Cir. 1999); *Trentham v. K–Mart. Corp.*, 806 F.Supp. 692, 705 (E.D.Tenn.1991); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996). As such, the Court will refer to Title VII and ADEA case law in disposing of plaintiff's THRA claims.

Defendants do not argue that plaintiff cannot make out a *prima facie* case of discrimination on the basis of race, sex, and age. In fact, plaintiff is an African American female over the age of forty. She was terminated and replaced by a Caucasian, male, younger employee. Defendants do not dispute plaintiff's qualifications for the position.

As referenced above in the context of plaintiff's FMLA retaliation claim, the plaintiff's establishment of a *prima facie* case of discrimination shifts the burden of production to the defendants to articulate a legitimate, non-discriminatory reason for her termination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Williams v. Nashville Network*, 132 F.3d 1123, 1131 (6th Cir.1997). Also as mentioned above, defendants have asserted that Richardson was terminated for failing to report to work for a week in September, which constituted a violation of CVS policy.

■ Following this assertion, Richardson re-assumes the burden of demonstrating that the defendant's proffered reason is a mere pretext for discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089;

*Williams,* 132 F.3d at 1131; *Avery Dennison,* 104 F.3d at 862. To meet this burden, the plaintiff can produce evidence that (1) the employer's reason has no basis in fact; (2) that the asserted reason did not actually motivate the discharge; or (3) that the reason was insufficient to motivate the discharge. *Hoskins v. Oakland County Sheriff's Dept.,* 227 F.3d 719, 731 (6th Cir. 2000); *Manzer v. Diamond Shamrock Chem. Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994).

Richardson attempts to rebut defendants' assertion that she was terminated for abandonment by rehashing the instances of counseling she received from Kennedy over the years. Essentially, plaintiff seems to argue that she was discharged because of her prior misconduct and poor performance, but that all of her counseling was discriminatory. However, plaintiff's own deposition testimony indicates that she was counseled for all aforementioned reasons, and the record does not contain any evidence that plaintiff disputed any of the relevant conduct at any time. Additionally, plaintiff has not presented any proof that any other employees who engaged in violations of CVS policy went without counseling or any other proof indicating her counseling was discriminatory.

Furthermore, the majority of the counseling Richardson received came from Kennedy. The decision to terminate Richardson was made by Seescholtz. Richardson never complained to CVS, the THRC, or anybody else that she felt Seescholtz's conduct was discriminatory in any way. Plaintiff has presented no evidence indicating that Seescholtz intended to terminate her employment for any reason than her perceived abandonment of the job. She has not presented any proof that Seesholtz had any unlawful, discriminatory intent in his decision to terminate her. Therefore, she cannot sustain her claim that she was terminated as discrimination because of her race, sex, and age.

### 2. Retaliation

Plaintiff also argues that she was terminated in retaliation for exercising her rights under the THRA. To reiterate from the Court's discussion above, Richardson must establish four elements of a *prima facie* case to sustain her claim, namely that (1) she engaged in activity protected by the THRA; (2) the defendants knew of the activity; (3) she suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000). Defendants challenge plaintiff's ability to carry this burden.

■ The Court finds that plaintiff has not presented sufficient proof to raise a genuine issue of material fact with respect to the fourth element of her claim. The only evidence plaintiff presents to prove causation is the temporal proximity between her complaints of discrimination in November 1998 and her termination in October 1999. As a matter of law, this evidence is insufficient to establish the requisite causal connection. A showing of close timing between protected activity and termination can be relevant to demonstrating a causal connection. *See Nguyen,* 229 F.3d at 563; *Jackson v. RKO Bottlers,* 743 F.2d 370, 377 (6th Cir.1984) However, the law is clear that loose temporal proximity, standing alone, cannot provide the basis of a causal connection for purposes of a plaintiff's *prima facie* case of retaliation. *Fenton v. HiSAN,* 174 F.3d 827, 832 (6th Cir.1999); *Cooper v. City of N. Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (four month time span); *see also Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 121 S.Ct. 1508, 1511, 149 L.Ed.2d 509 (2001) ("cases that accept mere temporal proximi-

ty between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' "); *Parnell v. West,* 1997 WL 271751, *3 (6th Cir. May 21, 1997) (six month time span). Richardson's demonstration of nearly eleven months between the time of her protected activity and the time of her termination is insufficient to raise a genuine issue of material fact regarding a causal connection.

### C. Intentional Infliction of Emotional Distress

 Finally, Richardson claims that defendants are liable for the Tennessee state law tort of intentional infliction of emotional distress ("IIED"). To make out an IIED claim, a plaintiff must demonstrate (1) the conduct complained of was reckless or intentional; (2) it is so outrageous that it would not be tolerated by a civilized society; and (3) it resulted in serious mental injury. *Lyons v. Farmers Ins. Exchange,* 26 S.W.3d 888, 893 (Tenn.Ct. App.2000) (quoting *Bain v. Wells,* 936 S.W.2d 618 (Tenn.1997)). Defendants argue that the conduct of which Richardson complains was not outrageous as a matter of law. They also argue that Richardson cannot establish that she suffered severe emotional distress.

 The insurance against frivolous claims of IIED is found in the plaintiff's burden to prove that the conduct was outrageous. *Miller v. Willbanks,* 8 S.W.3d 607, 614 (Tenn.1999). "This is an exacting standard requiring the plaintiff to show that the defendant's conduct is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting Restatement (2d) of Torts § 46, comment D (1965)).

The plaintiff has not met this burden. Richardson argues that the defendants' conduct was outrageous because it violated federal law. Even if this is found to be the case, a violation of federal law, without more, is not sufficiently outrageous to support an IIED claim.

Additionally, plaintiff has not presented proof that she suffered severe emotional distress. The only reference to plaintiff's mental state is found in the final paragraph of her response to defendant's motion for summary judgment. In that sentence, Richardson says merely that, "[t]he plaintiff has suffered severe emotional injury in the form of depression." (Court File No. 32, p. 26). The record does not contain any evidence of such depression, and the plaintiff has not presented any proof suggesting that she suffered any severe emotional injury. As the Tennessee Supreme Court has quoted

> Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress is so severe that no reasonable [person] could be expected to endure it.

*Miller,* 8 S.W.3d at 615 (quoting Restatement (2d) of Torts). Richardson's IIED claim will be dismissed.

An order shall enter.